(32 App. Div. 458.)

PEOPLE ex rel. BRYMER v. GRAY.

(Supreme Court, Appellate Division, Second Department. July 23, 1898.)

1. MUNICIPAL CORPORATIONS—FIRE MARSHAL.
    Upon the organization of the present city of New York under the new charter (Laws 1897, c. 378), the fire marshal of the Brooklyn fire department became entitled to a transfer to the new position of fire marshal for the boroughs of Brooklyn and Queens, either by section 722, as being a member of the uniformed force, or, in any event, by section 1536, as being a "subordinate" in the department.

2. SAME—DISCHARGED VETERANS.
    Such marshal, having been protected in his tenure of office during good behavior, both by the veteran acts and under the charter of the city of Brooklyn, became entitled to similar-protection under the charter of the new city, by virtue of section 127, to which section 779, authorizing the fire commissioner to remove him, is subordinate.

Appeal from special term, Kings county.

Action by the people, on the relation of Alonzo Brymer, against John M. Gray, to oust him from the office of fire marshal of the city of New York for the boroughs of Brooklyn and Queens, and to have the title of relator thereto established. From a judgment for defendant (51 N. Y. S. 1087), relator appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, and HATCH, JJ.

Hugo Hirsch, for appellants.
William J. Carr, for respondent.

HATCH, J. Upon the adoption of the charter of the Greater New York, the relator was found in the office of fire marshal in and for the city of Brooklyn. This office was created by chapter 373 of the Laws of 1889, which was an amendment to the charter of the city of Brooklyn. The relator was appointed by the fire commissioner, and held office during his pleasure. The duties attached to said office were, among other things, to investigate fires and their origin, and to report to the commissioner his opinion and conclusion of the matter investigated. By an amendment adopted in 1892, this law was amended (Laws 1892, c. 445), wherein it was provided that such fire marshal "shall rank as a member of the uniformed fire force of the department of fire, and shall be entitled to all the privileges and immunities thereof," except that he should not be placed upon the pension roll of the firemen's insurance fund. The power of removal, by the commissioner, at pleasure, was omitted. The amendment therefore accomplished two things affecting the status of the relator to the office,—it prevented his removal from the office at the pleasure of the commissioner, and it made him a member of the force, with such privileges and immunities as were enjoyed by the uniformed fire force of the department of fire of such city. By section 9 of the charter of the city of Brooklyn, the fire commissioner was required to make suitable regulations, under which the officers and men of the department were required to wear an appropriate uniform and badges; and this seems to have embraced, pursuant to sections 5, 6, and 7 of such charter, all of the officers and members of the fire department, for by the provisions of section 8 the names of all members of the fire department were required to be enrolled, under the direction of the fire commissioner. It seems clear from the provisions of these sections that the purpose was to have all of the officers and employés constituting the fire department uniformed; and as, by the provisions of the act, the fire marshal was appointed by the fire commissioner, and subject by its terms to his direction and control, and required to report to him, such commissioner was undoubtedly authorized to require the fire marshal to wear a uniform and badge. The object to be accomplished was practically the same in the one case as in the other. The force was required to be uniformed, as recited in section 9, for the reason that in case of fire the authority and relations of the officers and men might be known. It was quite as much within the line of the fire marshal's duty to attend fires as to investigate after. He might very well be enabled to determine the cause and origin of a fire at the time when it was occurring as at any time after. Indeed, his observation might resolve both questions at once, or enable him the more intelligently to pursue his subsequent investigation. He also possessed authority to enter and investigate buildings, and for such purpose needed a badge of authority, and, being uniformed, was enabled the more readily to compel recognition of his authority. It is true that the authority vested in the commissioner to remove without a trial did not embrace those members em-

ployed upon the force for extinguishing fires. But those persons so entitled to a public trial, and who could only be removed after such trial and for cause, were a part of the uniformed force.

The relator was subject to this rule, with all its privileges and immunities. The language of the act, "He shall rank as a member," in view of the duties he was to perform, and his relation to the department and its commissioner, seems to make it the intention of the legislature that he should so rank within the force as a member; not that he should be considered outside of the force, entitled to certain privileges and immunities, measured by what certain persons therein enjoyed, but that he was within the force, a member, with his rights and privileges, like the other members of the uniformed force. Such we believe to have been the intention to be gathered from the entire scheme, and therefore we are led to hold that he was a part of the uniformed fire department of the city. Such being the status of the relator in the fire department of the city of Brooklyn, we proceed to examine what his status was under the Greater New York charter.

Section 722 of such charter provides:

"The officers and members of the uniformed force and legally appointed firemen in the corporation formerly known as the mayor, aldermen and commonalty of the city of New York, and in the city of Brooklyn, and in the city of Long Island City are hereby made members of the fire department of the city of New York, as hereby constituted, and shall be assigned to duty therein by the fire commissioner, with the rank and grade now held by them respectively, as nearly as may be practicable."

Section 779 provides:

"The fire commissioner is hereby authorized to appoint and remove a **fire** marshal for the boroughs of Manhattan, the Bronx and Richmond, and a fire marshal to be seated in Brooklyn and to exercise his powers within the boroughs of Brooklyn and Queens."

By the express provisions of the charter, the uniformed fire force of the city of Brooklyn was continued as constituted when consolidation took effect, and its members became entitled to hold their respective positions and rank as nearly as the same was practicable under the new conditions. This depended upon the question whether the position held by any such member, or a similar one, existed under the consolidated governments. By the terms of the second section we have cited, provision is made for a fire marshal to be seated in the borough of Brooklyn, with authority to exercise power in such borough and in the borough of Queens. The question does not therefore permit of argument, as it rests upon clear legislative enactment; and, as so expressed, the uniformed fire force, officers and men, of the city of Brooklyn, were made members of the fire department of the city of New York, with the rank and grade held by them at the time when they were so made a part. This was something more than a transference of the person, with mere right of appointment, which might or might not be exercised, dependent upon the volition of the appointing power. The transfer was a transfer of the force as it was, with rank and grade as existing at such time, subject only to the qualification that in the New York fire department the same or similar positions were in existence, and were continued. The provision, therefore, which authorized the office of fire marshal to be seated in

the boroughs of Brooklyn and Queens, was precisely similar in character to the position which the relator held under the charter of the city of Brooklyn, the only change being in the extent of jurisdiction over which his authority was extended, and the somewhat enlarged character of his duties. An examination, however, of sections 779 to 783, inclusive, of the charter, shows that the duties devolved upon the fire marshal by the New York charter are the same in character as existed under the Brooklyn city charter, specified in greater detail, enlarged to some extent, and exercised in connection with the commissioner or alone. In the essential duties to be performed by him there has been little change. This construction seems to have obtained, and practical effect given to it by the officers charged with the execution of the New York charter, as the relator was permitted to enter into the office and perform its duties for a period of eight days after the charter took effect. If, however, this construction of the charter provisions to which reference has been made should not obtain, still the relator was transferred and placed in the position to which he was entitled by virtue of section 1536 of the charter.

This question has recently been determined, and the section construed, by this court, in People v. Cram, 53 N. Y. Supp. 110, opinion by Mr. Justice Bartlett, not yet officially reported. Therein it is held that dock masters under the charter of the city of Brooklyn were to be regarded as subordinates, within the meaning of that section. No sound reason can be assigned why, within the decision in that case, a different rule should obtain as to the office held by this relator. He was a subordinate, as he was subject to the direction and control of the fire commissioner, and the performance of the duties devolved upon him was subject to the supervision of such commissioner. The authority vested in the commissioner under the New York charter (section 728), to select officers, recognizes in terms that such officers are subordinates. In no view, therefore, is it permissible to say that the relator was not transferred to the fire department of the city of New York with the rank held by him, and entitled to the same or a similar position; and, as we have seen, the similar position existed at the time when such transfer took effect. Nothing contained in section 740 of the charter militates against this construction. It is true that by this section the grade, rank, and salary of officers and members of the uniformed force of the fire department of New York are fixed, and it does not mention the office of fire marshal; and it may be conceded for the purpose of this argument that it was not the scheme of the act creating this department to make the fire marshal a part of it. This, however, does not destroy the fact that the fire marshal of Brooklyn was a member of its uniformed force, and was, by force of the provisions of the charter already considered, transferred to the New York department. Being there, his right was to have his rank and office, so far as it might be practicable. Section 740 did not provide it, but sections 727, 728, and 779 did. The change worked by these sections was to authorize the commissioner to organize the fire department of New York into bureaus, as might be convenient and necessary for the performance of the duties devolved upon him; and, among the "bureaus" thus authorized, one

was charged with the investigation of the origin and cause of fires, the principal officers of which were called "fire marshals," and a branch of such bureau was required to be located in the borough of Brooklyn. It is therefore evident that the only change made was in the distribution of the force of the fire department. But this was only a change of name and form. The duties connected with and devolved upon the several branches were not, as we have seen, essentially changed. The officials still performed the same duties under the different creations as they had before performed; and in no sense can it be claimed that a designation of the relator to the position of fire marshal in the branch bureau created for the borough of Brooklyn was in any wise inconsistent with the reorganization of the New York fire department under the scheme of the charter, or that it was impracticable in any view of the matter. It did not tend in the slightest to destroy the harmony of the scheme. On the contrary, it fulfilled to the letter the evident intent of all the provisions of the charter relating to the subject.

This brings us to a consideration of the question of the tenure of office enjoyed by the relator. By section 779 of the charter of New York, the fire commissioner is authorized to appoint and remove fire marshals. Unless, therefore, the relator is saved from the operation of that section by force of some other law, this action must fail, as the power to remove is at the pleasure of the commissioner. It is claimed that the relator is so saved under the veteran acts. That he is an honorably discharged soldier of the late war is conceded. We have already seen that the relator was protected in his tenure of office under the charter of the city of Brooklyn during good behavior, and he was also undoubtedly protected under the veteran acts. By section 127 of the Greater New York charter it is provided:

"All veterans either of the army or navy or the volunteer fire departments, now in the service of either of the municipal and public corporations hereby consolidated, who are now entitled by law to serve during good behavior, or who cannot under existing law be removed except for cause, shall be retained in like positions and under the same conditions by the corporation constituted by this act, to serve under such titles and in such way as the head of the appropriate department or the mayor may direct."

There can be no doubt but that, in terms, this section is broad enough to embrace the relator. This view is scarcely contended against. It also appears that the office held by the relator is a subordinate office, under the decision we have cited, construing section 1536, and also by virtue of the New York charter provision (section 728). It therefore follows that the relator is protected, unless section 779 is controlling. People v. City of Brooklyn, 149 N. Y. 215, 43 N. E. 554; People v. Wright, 150 N. Y. 444, 44 N. E. 1036. The views expressed by this court through Mr. Justice Cullen, in People v. England, 16 App. Div. 97, 45 N. Y. Supp. 12, do not conflict with this holding. It was therein recognized that a subordinate officer was protected by the veteran acts, adopting in this respect the language of Andrews, C. J., in People v. Morton, 148 N. Y. 156, 42 N. E. 538. That relator was a subordinate we have already announced, and that he was such an officer as is protected must necessarily fol-

low. The charter must be construed as a whole, and upon this subject it seems to have been the evident policy of its framers to extend the protection guarantied by the veteran acts to all persons embraced within their terms who should be transferred from the positions occupied by them in the several municipalities consolidated to similar positions in the consolidated city. There would seem to be no reason why the rule should not be applicable to public servants under one government as was operative under the other, as the character of the duties performed remains in all substantial particulars the same, and is exercised in practically the same territory. In this respect we approve of the reasoning by Mr. Justice Chase in Jacobus v. Van Wyck, 53 N. Y. Supp. 71. Such being the manifest policy, section 779 must be deemed to have been enacted in subordination to its provisions; and, in the absence of words expressly excepting the office from the operation of the prevailing policy of the statute, no different rule can obtain. There may be cases where there is an inconsistency in applying such rule, as where the scheme of the charter would be defeated, or different commands of the statute could not be recognized, and force given to it. Such questions will be disposed of as they arise. We find nothing applicable to the present question requiring a different interpretation. Nothing in People v. Lathrop, 142 N. Y. 117, 36 N. E. 805, conflicts with this view. There it was manifestly destructive of the service to enforce the preference, and the act which gave the power of removal was passed subsequent to the act creating the preference. No such question arises here, as the two sections are but part of an entire scheme, and no such result flows from enforcing the general policy as the court there considered and found.

It follows that the judgment should be reversed, and judgment ordered for the plaintiff, in accordance with the prayer of his complaint. All concur.

---

(33 App. Div. 17.)

SCHEMERHORN et al. v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. July 26, 1898.)

1. ACCIDENT AT RAILROAD CROSSING—PROXIMATE CAUSE.

At a point on a narrow highway where the vehicle occupied by decedent and her companion was within 100 feet of the railroad crossing, and the railroad track, which was hitherto obscured, was less than half that distance at their side, a train approaching at a high rate of speed, and about 500 feet from the crossing, first apprised them of its approach by three piercing shrieks from the locomotive whistle. The whistle post was 1,400 feet from the crossing, but the first signals were given at the point stated. The horse was ordinarily gentle, but, frightened by the whistle and the rumble of the train, became uncontrollable, and carried them in front of the train, and decedent was killed. *Held*, that the negligence of the defendant in failing to give the whistle signals at the proper point was the proximate cause of decedent's death.

2. SAME.

